IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JERRY BROWN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 2808 |
| ) | |
| ILLINOIS DEPARTMENT OF NATURAL ) | |
| RESOURCES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Pro se plaintiff Jerry Brown ("Brown"), and employee of the Illinois Department of Natural Resources ("IDNR"), alleges that the IDNR violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, ("Title VII"), when IDNR employees did not consider Brown for promotion to the position of Oak Brook Office Supervisor due to his race (Black) and national origin (African-American), and in retaliation for Brown's earlier grievances and lawsuits filed against IDNR.

Now pending before the court are IDNR's "Motion for Summary Judgment" [25] and IDNR's "Motion to Strike in Part Plaintiff's Response to Defendants Local Rule 56.1 Statement of Uncontested Facts and Plaintiff's Statement of Additional Facts" [38]. For the reasons set forth below, IDNR's motion to strike is granted in part and denied in part and IDNR's motion for summary judgment is granted.

BACKGROUND[1]

Brown has been employed by IDNR's Waste Management and Research Center ("WMRC") since 1994 as a Manufacturing Process Engineer (now called a Technology Evaluation Specialist), where he is assigned to the Pollution Prevention ("P2") Group.[2] As a Technology Evaluation Specialist, Brown's duties include coordinating and managing long-term manufacturing evaluation projects that assist clients in developing and implementing new pollution prevention practices and technologies in industrial settings, conducting on-site assessments, writing proposals to solicit external funding, writing technical reports, developing and publishing pollution prevention materials, giving presentations, developing pollution

---

[1] The facts set forth in the Background section of this opinion are undisputed unless otherwise noted. To the extent Brown has responded that he "neither admits nor denies" certain relevant facts included in IDNR's Local Rule 56.1(a)(3) Statement, these facts are deemed admitted in accordance with Local Rule 56.1(b)(3)(B) and (C). *See also* Local Rule 56.2 "Notice to Pro Se Litigants Opposing Summary Judgment" ("If you do not provide the Court with evidence that shows that there is a dispute about the facts, the judge will be required to assume that the defendant's factual contentions are true . . . ."). This ruling specifically applies to paragraphs 24, 25, 27, 28, 37, 38, 39, 58, 59, 61, and 62 of IDNR's Local Rule 56.1(a)(3) Statement.

In light of Brown's status as a pro se litigant, the court declines to strike the remainder of Brown's Local Rule 56.1(b)(3)(B) Response, despite Brown's tendency to include argument, additional facts, or other superfluous language. The court is confident in its own abilities to place Brown's arguments in context and to review any factual references in light of the record as a whole in determining whether there is a genuine issue of material fact that requires trial in this case. The court has reviewed IDNR's concerns regarding Brown's Local Rule 56.1(b)(3)(B) Response and Brown's Local Rule 56.1(b)(3)(C) Statement and finds no prejudice to IDNR in proceeding in this fashion. IDNR's motion to strike is accordingly granted in part and denied in part.

[2] The WMRC is one of four surveys that previously made up the Office of Scientific Research and Analysis of IDNR. On July 1, 2008, the four surveys were transferred to the University of Illinois. The WMRC now operates as a division of the Institute for Natural Resources and has been renamed the Illinois Sustainable Technology Center. For ease of use, the court continues to refer to the WMRC by its original name at the time this lawsuit was filed.

2

prevention plans, and engaging in research activities. Brown works out of the Oak Brook, Illinois, office of the WMRC.

Timothy Lindsey, Ph.D. ("Dr. Lindsey") has served as the Manager of the P2 Group since April 1994. Dr. Lindsey works out of the Champaign, Illinois, office of the WMRC. At the Oak Brook office, Brown's direct supervisor was Ray Ronda ("Ronda") from 2001 through 2005. Ronda left the WMRC in the summer of 2005 for medical reasons. At that time, Dr. Lindsey agreed to provide supervision to the Oak Brook staff by driving to the Oak Brook office to meet with staff and provide direction when they needed it—typically once per week. In this capacity, Dr. Lindsey acted as Brown's direct supervisor beginning in the summer of 2005.

In the early spring of 2006, the WMRC decided to permanently house a supervisor in the Oak Brook office. In advance of this transition, Dr. Lindsey and another supervisor in the P2 Group (Dr. Kishore Rajogopalan) developed a position description for the new Oak Brook Office Supervisor.[3] Dr. Lindsey reviewed the position description with Katherine Day ("Day") (the Manager of the Human Resource and Finance Unit at the WMRC), and the position description was approved by George Vander Velde, Ph.D. ("Dr. Vander Velde") (the Director of the WMRC). The position description contained responsibilities similar to those performed by

---

[3] Brown appears to question whether Dr. Lindsey actually developed a new job description for the position of Office Supervisor, noting that no position description (new or old) was given to Brown at the time Brown applied for the Oak Brook Office Supervisor position and that the position description that was produced at discovery does not include a revision date. (Pl.'s 56.1(b)(3)(B) Resp. ¶¶ 23, 25 (citing Brown Aff. ¶ 24).) Accepting these facts as true, the court nevertheless finds that Brown's affidavit testimony and the lack of a revision date on the job description itself do not create a disputed question of fact as to whether the position description was actually revised in early 2006. This fact is also somewhat immaterial, as Brown agrees that "WMRC upper management changed the focus of the office supervisor position," (Pl.'s 56.1(b)(3)(C) Stmt. ¶ 8), such that "excellent networking skills . . . became a 'need' when WMRC upper management decided that it was a 'need.'" (Pl.'s 56.1(b)(3)(B) Resp. ¶ 26.)

3

Ronda, with additional emphasis placed on generating outside funding and networking.

On March 1, 2006, Dr. Lindsey announced at a staff meeting in the Oak Brook office that there was an opening for the position of Oak Brook Office Supervisor, and he invited the professional staff in the Oak Brook office to submit applications for this position. Although Brown was not in attendance at the March 1, 2006 meeting, Dr. Lindsey sent an e-mail to Brown on that same day telling Brown about the position and listing the four criteria that Brown would need to address in his application, should Brown decide to apply for the position. The four criteria were the same criteria Dr. Lindsey had given to the rest of the Oak Brook staff.

The managers responsible for hiring the Oak Brook Office Supervisor were Dr. Lindsey, Day, and Dr. Vander Velde (collectively "the selection committee"). Although the philosophy of the P2 Group is that all of its engineers typically should write grant proposals and generate revenue, both Dr. Lindsey and Day attested that "the person holding the Oak Brook Office Supervisor position needed excellent networking skills," in large part because economic times dictated an emphasis on writing grant proposals and generating funding. (Def.'s 56.1(a)(3) Stmt. ¶ 26; Lindsey Aff. ¶ 12; Day Aff. ¶ 14.)[4] Dr. Lindsey and Day also stated that the selection committee envisioned the ideal candidate as having experience and skills, along with their technical assistance expertise, "in the areas of technical writing, leadership, personal relations, networking, proposal writing, project and grant management, and an understanding of the

---

[4] Brown has denied that the selection committee *should have* focused on the skills of networking and writing grant proposals, noting that all P2 engineers were already required to engage in this type of activity. (*See* Pl.'s 56.1(b)(3)(B) Resp. ¶ 26.) However, Brown's denial does not cite to any evidence in the record suggesting that the selection committee did not honestly believe these skills were essential to filling the Oak Brook Office Supervisor position in 2006, as discussed below.

4

importance of administrative tasks and a realistic vision and plan for moving the Oak Brook Office forward into the future." (Def.'s 56.1(a)(3) Stmt. ¶ 38; Lindsey Aff. ¶ 19; Day Aff. ¶ 19.) In their shared opinion, "[t]he ideal candidate also would have an understanding of how important it was to anticipate critical issues and to be able to deal with a broad range of organizations and manufacturing processes." (Def.'s 56.1(a)(3) Stmt. ¶ 39; Lindsey Aff. ¶ 20; Day Aff. ¶ 20.) Dr. Lindsey and Day also agreed that "[i]t was essential that the person selected also have excellent interpersonal and verbal communication skills because he or she would serve as an ambassador for WMRC." (Def.'s 56.1(a)(3) Stmt. ¶ 40; Lindsey Aff. ¶ 20; Day Aff. ¶ 20.)

The selection committee received three applications for the position. These applications were from Debra Jacobson ("Jacobson"), Riyaz Shipchandler ("Shipchandler"), and Brown. After conducting interviews and reviewing again the candidates' written submissions, the selection committee filled out a Candidate Evaluation Form for each candidate and used the numeric scores from this evaluation to rank the three candidates. The selection committee chose Jacobson—who is White and Caucasian—for the Oak Brook Office Supervisor position.

Dr. Lindsey attested that "Jacobson's submitted vision plan was deemed superior to the other two candidates['], both in terms of quality of presentation and substance." (Def.'s 56.1(a)(3) Stmt. ¶ 60; Lindsey Aff. ¶ 23.)[5] Dr. Lindsey further attested that "Jacobson had a proven track record—one of the best at WMRC—with proposal submission and securing grants,

---

[5] Brown makes much of the fact that Jacobson's vision plan was never shared with the staff in the Oak Brook office. (Pl.'s 56.1(b)(3)(B) Resp. ¶ 60.) However, there is no evidence in the record that the vision plan was ever intended to be used for any purpose other than gauging the candidates' overall leadership abilities and skill sets during the interview process. The court finds it unreasonable to infer that Jacobson's vision plan was actually inferior to those submitted by Brown and Shipchandler merely because it was not shared with the Oak Brook office staff once she was hired for the position.

as well as excellent project management skills," and Dr. Vander Velde attested that Jacobson had demonstrated "sales, marketing and networking skills," as well as an ability to obtain significant external funding. (Def.'s 56.1(a)(3) Stmt. ¶ 61; Lindsey Aff. ¶ 23; Vander Velde Aff. ¶ 13.) Dr. Vander Velde further attested that Jacobson "demonstrated the ability to work with [WMRC] clients in a range of activities," and Dr. Lindsey noted that Jacobson "was well thought of by her peers, both internally and nationally," and had "an excellent record of fulfilling her administrative duties, accurately and on time." (Def.'s 56.1(a)(3) Stmt. ¶ 62; Vander Velde Aff. ¶ 13; Lindsey Aff. ¶ 23.)

According to Dr. Vander Velde, the selection committee did not select Brown "because he was not nearly as strong in demonstrating proven marketing and sales skills, in his ability to obtain significant external funding on his own, and in previous personnel management." (Def.'s 56.1(a)(3) Stmt. ¶ 63; Vander Velde Aff. ¶ 14.)[6] Dr. Vander Velde also attested that the selection committee did not select Shipchandler because, "though [he] demonstrated strong sales and marketing skills, strong professional skills[,] aggressive ability in work performance and good people skills, he lacked experience in most areas, particularly personnel management." (Def.'s 56.1(a)(3) Stmt. ¶ 65; Vander Velde Aff. ¶ 14.)

---

[6] Brown does not dispute that the selection committee found him to be "not nearly as strong" as Jacobson in these areas, and for that reason did not select him for the position of Oak Brook Office Supervisor. (Pl.'s 56.1(b)(3)(B) Resp. ¶ 63.) Rather, Brown argues that the selection committee *should not have come to this conclusion* because Brown has strong skills and experience in the areas of marketing/sales and personnel management, and the sources of funding for which Jacobson had applied were already earmarked for WMRC. (*Id.* (citing additional facts).) Because Brown's denial does not directly contradict or call into question Dr. Vander Velde's affidavit testimony, IDNR's statement is generally deemed admitted.

6

The decision to hire Jacobson for the Oak Brook Office Supervisor position was announced to other WMRC staff on April 10, 2006. Brown filed an EEOC charge on January 30, 2007, alleging that IDNR discriminated against Brown on account of his race and in retaliation for his previously-filed EEOC charges and lawsuits[7] when it failed to promote him to the position of Oak Brook Office Supervisor. Brown filed the instant lawsuit on May 18, 2007.

## LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmovant's favor. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 857 (7th Cir. 2007). However, "[o]nce a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)). The court does not make credibility

---

[7] In 2002, Brown filed a lawsuit against IDNR alleging that IDNR failed to promote Brown based on his race and retaliated against him for complaining about discrimination. *Brown v. Ill. Dep't of Natural Res.*, 02 C 0398 (N.D. Ill. 2002) ("*Brown I*") (J. Nordberg). The district court granted summary judgment in favor of IDNR, and the Seventh Circuit affirmed. *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675 (7th Cir. 2007). Brown filed a subsequent lawsuit against IDNR in May 2005, alleging once again that IDNR failed to promote him based on his race and retaliated against him for complaining about discrimination. *Brown v. Illinois Dep't of Natural Resources*, 05 C 2460 (N.D. Ill. 2005) ("*Brown II*") (J. Shadur). The district court in *Brown II* granted summary judgment in favor of IDNR on February 9, 2009.

determinations or weigh conflicting evidence. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Summary judgment will be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## ANALYSIS

1.   Title VII Discrimination

As a Title VII plaintiff, Brown ultimately bears the burden of proving that he was the victim of intentional discrimination. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To survive summary judgment, this means that Brown must "present[ ] evidence from which an inference of discrimination could be drawn." *O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002). Brown may do so under either the "direct" or "indirect" method of proof. *Fischer v. Avandade, Inc.*, 519 F.3d 393, 401-02 (7th Cir. 2008). In this case, Brown has elected to proceed using the indirect method of proof, first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Pl.'s Resp. at 4.)

To prevail under the indirect method, Brown must first establish a prima facie case of discrimination by "show[ing] that 1) he belongs to a protected class, 2) he applied for and was qualified for the position sought, 3) he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003) (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001)). The establishment of a prima facie case

creates a rebuttable presumption of discrimination, which then shifts the burden to the employer to set forth a legitimate, nondiscriminatory reason for its failure to promote the plaintiff. *Id.* Once the employer has articulated such a reason, the burden shifts back to the plaintiff to demonstrate that the stated reason is actually a pretext for discrimination. *Id.*

"The purpose of the prima facie case is to 'eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection.'" *Hong*, 993 F.2d at 1264 (quoting *Burdine*, 450 U.S. at 253-54)). Accordingly, "where the nonmovant is unable to establish at least the minimal elements of the prima facie case under the *McDonnell Douglas* methodology, the entry of summary judgment is required." *Id.* at 1262 (quoting *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 568 (7th Cir. 1989)). On the other hand, "[t]o withstand summary judgment on the prima facie case, [Brown] need only show that there is a genuine issue of material fact regarding these elements." *O'Neal*, 293 F.3d at 1003.

IDNR argues that Brown cannot establish a prima facie case of discrimination because Brown cannot show that Jacobson was not better qualified for the position of Oak Brook Office Supervisor. In support of its argument, IDNR notes that Jacobson possessed superior networking skills compared to Brown, had a better reputation for submitting proposals and securing grants, and was well thought of by her peers. Brown does not dispute that Jacobson's qualifications in these areas were stronger than his—although he notes that he, too, had strong marketing and sales skills. Rather, Brown contends that he had *different* skills which made him equally qualified for the Oak Brook Office Supervisor position. Brown notes that he had one more year of experience at the WMRC than Jacobson, that he had at least ten more years of engineering experience than Jacobson, and that he holds an advanced degree in comparison to

9

Jacobson's bachelor's degree.[8]

The problem with Brown's argument is that it fails to take into account the factors on which the selection committee actually chose to focus. Both Brown and IDNR agree that "WMRC upper management changed the focus of the office supervisor position," and that members of the selection committee felt that "the person holding the Office Supervisor position needed excellent networking skills" to comply with the WMRC's "renewed emphasis on generating outside funding." (Pl.'s 56.1(b)(3)(C) Stmt. ¶ 8; Def.'s 56.1(a)(3) Stmt. ¶¶ 25, 26.) It is undisputed that the selection committee considered networking skills to be a top priority, and that Jacobson had more experience in this area. As Brown acknowledges in his response brief, the position requirements "focused on networking" and Jacobson was "the only employee in the Oak Brook office with years of networking experience." (Pl.'s Resp. at 6.) It therefore appears undisputed that Jacobson was better qualified for the position of Oak Brook Office Supervisor than Brown. To put it bluntly, "[i]f the person who got the promotion was better qualified, the plaintiff's case fails." *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009).

Conflating the first and the third steps of the *McDonnell Douglas* burden-shifting approach, Brown argues that the qualifications themselves were nothing but a pretext for discrimination. It is Brown's contention that IDNR "tailored the job to the experiences of the employee that [IDNR] wanted to promote to the position." (Pl.'s Resp. at 5.) Brown speculates that "[i]t was only when WMRC upper management realized that [Brown] was the most senior

---

[8] Brown does not include any information about Jacobson's start date, engineering credentials, or education in his Local Rule 56.1(b)(3)(C) Statement. Nevertheless, because the admission of these facts does not prejudice IDNR, the court will assume they are true for purposes of its analysis.

engineer and the most experienced engineer in the office . . . that WMRC upper management decided to change the major requirements of the position." (Pl.'s Resp. at 6.) However, Brown does not direct the court to any evidence of such a "realization" on the part of IDNR decision-makers, and the court notes that its favor toward the nonmoving party "does not extend to drawing '[i]nferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008) (quoting *Fischer*, 519 F.3d at 401)).

Even if the court accepts as true Brown's assertion that he was the best candidate to fit the job description as it had previously been drafted, this fact alone does not create a reasonable inference that WMRC managers favored Jacobson for the position of Oak Brook Office Supervisor and deliberately crafted qualifications to suit her skill set. Dr. Lindsey and Day both attested that "the person holding the Office Supervisor position needed excellent networking skills," in large part because economic times dictated an emphasis on writing grant proposals and generating funding." (Def.'s 56.1(a)(3) Stmt. ¶ 26; Lindsey Aff. ¶ 12; Day Aff. ¶ 14.) As managers, Dr. Lindsey and Day were free to focus on this aspect of the job, regardless of whether other P2 staff members were also responsible for contributing to the fundraising endeavor. It is not the court's job to "sit as a super-personnel review board that second-guesses an employer's facially legitimate business decisions," *Argyropoulos*, 539 F.3d at 736 (citation omitted), and the court finds nothing inherently invidious about this change in focus. To establish pretext, Brown must offer facts suggesting that the selection committee's stated reason for changing the qualifications for the position was dishonest. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). In other words, Brown must demonstrate that IDNR's articulated reason "either: 1) had no basis in fact; 2) did not actually motivate its

decision; or 3) was insufficient to motivate its decision." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002). Brown has produced no evidence suggesting that grant proposals and funding were not actually a concern for the WMRC in the spring of 2006, or that it was unreasonable for WMRC management to seek an Office Supervisor with networking skills for the purpose of addressing these concerns. Without more, no reasonable factfinder could find that IDNR created the new job description because it's managers favored Jacobson or disfavored Brown.

Because Brown has not produced evidence that IDNR's stated reason for creating the new job description was dishonest, the court's inquiry need not proceed any further. However, the court will briefly address Brown's contention that the evidence shows WMRC management generally favored Jacobson for the position of Oak Brook Office Supervisor. First, the court does not agree that this inference can be reasonably drawn from the timing of the promotion decision. Brown notes that Ronda left his position in the summer of 2005, but the position was not filled until April 2006—during which time Jacobson had allegedly acquired the requisite years of experience to qualify for the position in October 2005.[9] From this timing, Brown concludes that IDNR purposely waited to fill the position until Jacobson had gained enough experience to become an eligible candidate. The court finds Brown's conclusion to be an unreasonable inference. If IDNR had been merely waiting for Jacobson to reach a point of eligibility, it does not make sense for IDNR to have waited six more months after Jacobson became eligible before posting the position for hiring. Dr. Lindsey, Day, and Dr. Vander Velde have all explained that the decision to fill the position of Oak Brook Office Supervisor was made in the spring of 2006, when Dr. Lindsey's commute from Champaign and his responsibilities in

---

[9] Again, the court notes that Jacobson's start date is not part of the record.

the Oak Brook Office became too time-consuming, and when it became clear that Ronda would not return to work. (Def.'s 56.1(a)(3) Stmt. ¶ 22.) Brown cites to his own affidavit testimony in arguing that this explanation is false, asserting that "[w]hen Ronda left WMRC in 2005, he stated that he would not return due to health reasons."[10] (Brown Aff. ¶ 28.) Viewing the facts in the light most favorable to Brown, the court accepts as true that IDNR knew Ronda would not be returning to work after he left his position in the summer of 2005. However, this fact does not suggest that WMRC management was merely biding time in order to hire Jacobson. If this was IDNR's goal, the position could have been posted as early as October 2005 and Dr. Lindsey could have returned to his usual duties at that time. It is undisputed that IDNR decided to have Dr. Lindsey fill in as an out-of-office supervisor after Ronda left his position, and it is likewise undisputed that IDNR changed course once this approach became burdensome. Any connection between this chain of events and Jacobson's eligibility for the position is pure speculation and is not supported by the record.

Second, and more important, the court notes that "Title VII only prohibits discrimination based on an illegal motive." *Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009). To the extent that Brown's evidence could be viewed as demonstrating IDNR's favoritism towards Jacobson *as an individual*, this evidence tends to detract from Brown's theory that he was discriminated against on account of his race or national origin. *Cf. Dodge v. Lincoln Nat'l Life Ins. Co.*, No. 1:05-CV-92-TS, 2006 WL 1722363, at *9 (N.D. Ind. 2006) ("Title VII does not prohibit an employer from making a business decision to develop an employee for a future promotion or job

---

[10] The court notes there are obvious hearsay concerns with this testimony, but declines to rule on the admissibility of this evidence at this time because the question of hearsay has not been addressed by either party.

13

vacancy, as long as it does not discriminate on the basis of protected characteristics in the process."). There is simply no evidence before the court that IDNR favored Jacobson because of her race or national origin.

Because there are no disputed questions of material fact regarding Brown's inability to satisfy the elements of his prima facie case, and because Brown has failed to demonstrate that IDNR's stated reasons for changing its job description were pretextual, summary judgment is granted in favor of IDNR on Brown's discrimination claim.

2.   Title VII Retaliation

Title VII also prohibits retaliation against an employee who has filed charges of discrimination pursuant to statute. 42 U.S.C. § 2000e-3. As with discrimination claims, a plaintiff can prove retaliation through either direct or indirect evidence. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

Under the direct method, Brown must present evidence of "(1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." *Id.* Proof under the direct method can be made through either direct evidence (essentially a near admission of wrongdoing) or circumstantial evidence (evidence that supports a reasonable inference that an employer acted because of a forbidden animus). *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003). In this case, it is undisputed that Brown's EEOC charges and previous lawsuits were statutorily protected activities of which WMRC management was aware, and that failure to promote is considered an adverse employment action. *See Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008) ("A cognizable adverse employment action is a 'significant change in employment status, such as hiring, firing, *failing to*

14

*promote*, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'") (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)) (emphasis added). However, the parties part ways on the issue of causation. IDNR contends that Brown cannot prevail because the only evidence he has of causation is the general sequence of events in this case—that the failure to promote occurred "on the heels of or simultaneously with" his previous lawsuits. (Def.'s Mem. at 9.) Because "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim," *Brown I*, 499 F.3d at 685 (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007)), IDNR argues that Brown cannot prevail under the direct method of proof.

Brown responds with a series of observations, speculating that there could be a connection between Brown's previous lawsuits in 2002 and 2005 and the failure to promote Brown in 2006. First, Brown notes that Shipchandler was deemed unqualified for the position of Oak Brook Office Supervisor due to his lack of experience and, once Shipchandler was removed from the equation, the field of applicants would have been narrowed down to just Brown and Jacobson. Second, Brown notes that at the time of the interviews and promotion decision, Brown was currently engaged in litigation against IDNR in *Brown II*. Brown assumes that this situation would have made it difficult for IDNR to promote Brown for two reasons: (1) as the Oak Brook Office Supervisor, Brown would be required to supervise Malcom Boyle ("Boyle"), who was a named defendant in *Brown I*[11] and "WMRC management had no plans to have Plaintiff supervise Boyle," and (2) "WMRC management would be concerned about promoting

---

[11] Boyle was the Oak Brook Office Supervisor prior to Ronda taking the position in 2001. In that capacity, Boyle had been Brown's immediate supervisor.

Plaintiff to a position where Plaintiff would have access to confidential information about WMRC." (Pl.'s Resp. at 10).

The court recognizes that Brown's arguments make sense in the abstract. The problem is that there is no evidence in the record that the person in the position of Oak Brook Office Supervisor would be in charge of supervising Boyle or would have access to confidential information. The court is unaware of Boyle's current job title, although it appears that Boyle was *promoted* from the position of Oak Brook Office Supervisor once Ronda took the helm. *Brown I*, 499 F.3d at 683 n.7 (noting that "Boyle transferred to a different position after another, higher-level employee left his employment with the WMRC"). There is also a lack of record evidence describing the positions over which the Oak Brook Office Supervisor was in charge, and there is no evidence that the selection committee considered the relationship between Brown and Boyle one way or another in making its promotion decision. Likewise, Brown points to no evidence that the Oak Brook Office Supervisor would have access to sensitive or "confidential" information, that the Oak Brook Office Supervisor could not perform satisfactorily without access to such information, or that this was a concern of the selection committee. Brown guesses that these were areas of concern for the selection committee, but he directs the court to no evidence supporting his assumptions. For all anyone knows, the selection committee considered these matters but determined that they would not be a problem. On the record as it stands, a jury would not be in a position to weigh competing evidence, but would instead be invited to speculate as to the selection committee's motives. The court cannot permit Brown to proceed in this fashion under the direct method of proof. *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("Speculation does not create a *genuine* issue of fact; instead, it creates a

16

false issue, the demolition of which is a primary goal of summary judgment."). Brown therefore fails to adequately present his case under the direct method of proof.

Under the indirect method, Brown must show that (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse action from the employer; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Sitar*, 344 F.3d at 728. At the outset, the court notes the fact that Jacobson was ultimately offered the position of Oak Brook Office Supervisor cannot by itself support an inference of retaliation, because Brown and Jacobson were not similarly situated with respect to their qualifications for the position, as discussed above. Assuming that Jacobson and Shipchandler were similarly situated to Brown in all other material respects, and that neither Jacobson nor Shipchandler had filed any discrimination complaints against IDNR, the court also finds no evidence that Brown was generally treated less favorably than Jacobson or Shipchandler during the application process. It is undisputed that Brown was provided with the same application criteria as the other applicants, that he had the same opportunity to interview with the selection committee, where he was asked the same set of questions as the other applicants, and that his interview and application were scored using the same numeric rating system. Brown argues that Jacobson was the only applicant "seriously considered for the office supervisor position," (Pl.'s Resp. at 10), but there is no evidence in the record that this is so.

Brown does direct the court to one aspect of the selection committee's analysis that could be a potential source of concern. It is undisputed that during the selection process Day focused on Brown's "history of argumentative behavior with both WMRC staff and clients," causing her

17

to view Brown's interpersonal and leadership skills as a "potential weakness." (Def.'s 56.1(a)(3) Stmt. ¶ 53.) Brown contends that any complaints about his behavior came from a time period when his supervisor, Boyle, was generating biased reviews of Brown's work—reviews that became the subject of *Brown I*—and IDNR admits that it has not received complaints about Brown's behavior since 2001. (Def.'s 56.1(b)(3)(C) Resp. ¶ 16.) In *Brown I*, the Seventh Circuit found "the record evinces that . . . [t]wo different supervisors documented these problems in performance evaluations and disgruntled clients echoed these issues in multiple complaint letters to the WMRC regarding Brown." *Brown I*, 499 F.3d at 683-84. It appears to the court that the concern voiced by Day—that Brown has a "history of argumentative behavior with both WMRC staff and clients"—is most reasonably interpreted to refer to Brown's documented level of performance on the job, and not any actions involving Brown's protected right to assert claims against Boyle and others at the WMRC. This is the interpretation asserted by Brown as well, who notes that the selection committee "relied on *character traits* from five years earlier . . . as a reason for not promoting Plaintiff." (Pl.'s Resp. at 11 (emphasis added).) However, the selection committee was not required to ignore Brown's past performance, and there is no indication that the selection committee failed to consider any similar complaints that had been made against Jacobson or Shipchandler, thereby treating them more favorably than Brown. Because Brown cannot demonstrate that he was treated less favorably then Jacobson or Shipchandler, he cannot prevail under the indirect method of proof.

On the record before it, the court finds that Brown has failed to set forth evidence from which an inference of retaliation could be reasonably drawn. Summary judgment is therefore granted in favor of IDNR on Brown's retaliation claim.

## CONCLUSION

For the reasons set forth above, IDNR's motion to strike is granted in part and denied in part and IDNR's motion for summary judgment is granted in its entirety.

ENTER:

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: May 15, 2009